UNITED STATES of America, Appellee,

v.

Geoffrey William BRILEY, Appellant.

No. 83–1487.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1983.

Decided Feb. 2, 1984.

**1302**

James M. Rosenbaum, U.S. Atty., Deborah Kleinman McNeil, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., for appellee.

Stephen W. Cooper, Neighborhood Justice Center, Inc., St. Paul, Minn., for appellant.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

HENLEY, Senior Circuit Judge.

Geoffrey William Briley appeals from his conviction for bank robbery under 18 U.S.C. § 2113. The primary issue on appeal is the legality of Briley's arrest. Specifically, Briley contends that his warrantless arrest in his home violated the fourth amendment. In addition, he contends the police lacked probable cause to arrest him and that the identification procedures utilized were impermissibly suggestive. We affirm the judgment of the district court.[1]

On September 29, 1982 the First Federal Savings and Loan Association in St. Paul, Minnesota was robbed of approximately $2,246.00. When the robber entered the bank, threw a knapsack on the counter and demanded money, one of the tellers put the money and what is known as a security pack in the knapsack. As the robber fled, the teller saw the security pack explode and observed the escaping red dye. Two tellers interviewed on the day of the robbery described the robber as a young male, about 5′6″ tall, with short brown hair and a scar near his right eye, wearing a hat and sunglasses.

On November 1, 1982 FBI Agent Dennis Conway was informed that "Crimestoppers" had received an anonymous telephone call that First Federal had been robbed by a person named Jeff Reiley who lived at Apartment 13, 1635 Sherburn Avenue, St. Paul. The caller also stated that when Reiley robbed the bank, a red dye explosive had gone off.

Agent Conway then went to the address given by the caller. A woman named Rosalie Rivera came to the door and let Conway in. Conway identified himself and asked Briley, who was in the apartment, if his name was Jeff Reiley. He replied that his name was Briley. Conway told Briley that he was suspected of the robbery. They talked for some time and Briley denied any involvement in the crime. No arrest was made and Conway left after the interview. Thereafter, Agent Conway notified the St. Paul Police Department and advised them of the information he had on the case and that Briley fit the description of the robber.

Officer Johnson of the St. Paul Police Department put together a photospread consisting of twelve pictures to show to witnesses. Officer Johnson showed the photospread to three of the witnesses at separate times and at different locations. Although none of the witnesses made a positive identification, one of them stated that Briley had the same cheekbones as the robber, one indicated that Briley could very possibly be the robber, and one witness did not pick Briley's photo. Thereafter a "probable cause pickup" for Briley was listed in the Daily Operations Report that is supplied to all officers as they come on

---

1. The Honorable Diana E. Murphy, United States District Judge, District of Minnesota.

duty. Evidently no attempt to get a warrant for Briley's arrest was made, although there appears to have been ample time to do so.

On November 18, 1982 two St. Paul police officers noted that the Operations Report listed for Briley an address in their patrol area, and went to 1635 Sherburn to see if they could determine Briley's whereabouts. The officers checked the mailboxes at the apartment building and found the name "Rivera" was listed for Apartment 13. When the officers rang for the caretaker, a man answered and said that he did not know where Briley was but that he had lived in the building. When asked for Briley's forwarding address, the caretaker led them back to his apartment. The officers stated that they were looking for Geoffrey Briley. A woman in the apartment named Rosalie Rivera replied that she did not know where he was at that time. She then mentioned that she was Briley's girlfriend and asked why they wanted to see him. The officers replied only that it was an important matter. Because they did not obtain any information about where Briley was, the officers turned to leave the apartment and the building. As they did, Rivera said, "All right, he's in my apartment. Come with me." She took them to Apartment 13, opened the door and gestured with her hand at Briley, who was standing in the apartment. The officers asked him if he was Briley and he said he was. The officers arrested Briley and took him to the police station.

The next day a lineup containing Briley and four others was conducted. Each subject was required to turn and speak. The three witnesses who viewed the lineup were seated apart and did not communicate with each other. Although one of the witnesses made no identification, another wrote on her identification form that Briley looked and sounded like the robber. The third witness wrote that Briley's facial features, build and voice were much the same as the robber's and noted Briley's scar under his right eye.

Later that same day Agent Conway and a St. Paul police officer interviewed Briley. Briley was given his *Miranda* rights and he said that he understood them. During the interview Briley admitted his involvement with the robbery and also implicated a person named Jon Tucker. Tucker was located and interviewed but initially denied any involvement. At a second interview held in Briley's apartment, Tucker waived his rights and gave a statement implicating himself and Briley.

Subsequently both Briley and Tucker were indicted for the First Federal robbery. Tucker pleaded guilty pursuant to a plea agreement while Briley waived a jury trial and was tried to the court on stipulated facts. He was found guilty and sentenced to serve six months of a three year sentence. Time served was to be followed by three years probation. He was also required to make restitution of his share of the robbery proceeds.

Briley contends that the warrantless arrest in his home violated his fourth amendment rights. He alleges that his confession and any identifications resulting from the subsequent lineup must be suppressed as the fruit of that illegal arrest. The government responds by stating that Briley's arrest was not illegal since the police entered the apartment by virtue of Rosalie Rivera's consent. The district court agreed with the government and held that Rivera's consent negated any illegality that may have attended Briley's warrantless arrest.

Our starting point of analysis is the Supreme Court's decision in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton* the Court held that the fourth amendment "prohibits the police from making a warrantless and *nonconsensual entry* into a suspect's home in order to make a routine felony arrest." *Id.* at 576, 100 S.Ct. at 1375 (emphasis added). While *Payton* did not deal with the issue of whether an initial consensual entry would justify a subsequent warrantless arrest, we have held that a valid and voluntary consent may be followed by a warrantless in-home arrest. *See United States v.*

*Shigemura,* 682 F.2d 699, 706 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983); *United States v. Ruiz-Altschiller,* 694 F.2d 1104, 1106–07 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3117, 77 L.Ed.2d 1371 (1983). Thus, we look to the question whether Rivera's consent to the entry of the apartment was valid.

▬ The test for determining whether a consent is valid is a familiar one. The question is "whether ... the consent is given voluntarily and without coercion." *United States v. Dennis,* 625 F.2d 782, 793 (8th Cir.1980). This is a question of fact to be determined from all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–2048, 36 L.Ed.2d 854 (1973). It is clear that the burden is on the government to show that the consent was freely given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797 (1968). It is also clear that a third party may give consent as long as the third party had "common authority" over the premises. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). Common authority has been defined as "mutual use of the property by persons generally having joint access or control for most purposes....", *See Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. Since Rivera and Briley shared the apartment, either could consent to the officers' entry.

Briley contends that Rivera's consent was invalid since the officers only told her they wanted to talk to Briley, and did not say they would arrest him. The government alleges that a consent to enter may be voluntary and therefore will justify a subsequent arrest even where obtained by deception.

The government cites *United States v. Ruiz-Altschiller, supra,* for this proposition. This case does not stand for such a broad statement. Cases such as *Ruiz-Altschiller* deal with the situation where an undercover police officer obtains consent to enter a home by concealing his true identity. Commonly the suspect invites the undercover agent into his home for the purpose of conducting illegal business, typically a drug transaction. The Supreme Court has found no constitutional infirmity in such a set of circumstances.

> [W]hen ... the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent ... may accept an invitation to do business and may enter ... for the very purposes contemplated by the occupant.

*Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966).

The situation with which we are here confronted is clearly distinguishable. Here uniformed policemen entered Briley's apartment for the purpose of making a routine felony arrest. Rivera gave no consent to the entry for the "purposes of transacting unlawful business." *Id.* Thus, the rule that "[a]n undercover police officer's entry by consent, though obtained by deception, is not prohibited by the Fourth Amendment," *Shigemura,* 682 F.2d at 706, simply does not apply.

▬ In contrast to the government's assertion that deception is permissible in obtaining consent, we have stated that "[m]isrepresentations about the nature of an investigation may be evidence of coercion." *United States v. Turpin,* 707 F.2d 332, 334 (8th Cir.1983); *see also United States v. Johnson,* 626 F.2d 753, 757 (9th Cir.1980), *aff'd on other grounds,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). The misrepresentation may even invalidate the consent if the consent was given in reliance on the officer's deceit. *Turpin,* 707 F.2d at 335; *see also Bumper v. North Carolina,* 391 U.S. at 548–50, 88 S.Ct. at 1791–1792.

▬ However, there was no such deceitful misrepresentation here. The officers' cryptic statement that they had important matters to discuss with Briley does not ap-

pear to have been said with the intention of tricking Rivera into consenting to an entry. At the time the officers made the statement, they were simply trying to locate Briley; they were not yet seeking permission to enter Briley's apartment. It is highly significant that the officers were leaving when Rivera stopped them, volunteered Briley's whereabouts, and consented to their entry into the apartment. Furthermore, Rivera knew that Briley was a suspect in the robbery. She must have known arrest was a possibility at some point. When the officers, without being explicit, said they wanted to see Briley on an important matter Rivera sought no further elaboration. The officers had a right to go about their duties "without gratuitously advertising [their] every move to anyone [they] might encounter...." *In re Anthony F.,* 293 Md. 146, ——, 442 A.2d 975, 980 (1982).

Moreover, our examination of the totality of the circumstances leads us to conclude that Rivera's consent was voluntary. The officers did not misrepresent the fact that they had no search or arrest warrant. *See, e.g., Bumper v. North Carolina,* 391 U.S. at 549, 88 S.Ct. at 1792 (false claim of lawful authority may invalidate consent). Nor did they threaten to obtain a search or arrest warrant if consent were withheld. *See, e.g., United States v. Boukater,* 409 F.2d 537, 538 (5th Cir.1969). There has been no showing that Rivera lacked the maturity, sophistication, or intelligence to give an effective consent, *see, e.g., United States v. Mayes,* 552 F.2d 729, 732 (6th Cir.1977), nor is there indication that Rivera was unaware of her right to withhold consent. She initially denied that she knew where Briley was and as the officers were leaving voluntarily changed her mind and consented to their entry of the apartment.[2] *See, e.g., Schneckloth,* 412 U.S. at 249, 93 S.Ct. at 2059.

Our holding is a narrow one. The foregoing is not meant to imply that Rivera's consent would be considered voluntary had the police intentionally attempted to trick her by falsely stating their purpose. A different case might be presented had the police specifically told Rivera they were not seeking to arrest Briley or that he was not a suspect. We hold only that, in these particular circumstances, Rivera's consent was not coerced.

We turn briefly to Briley's assertion that the officers' failure to get a warrant in these circumstances was not an isolated instance. He contends that it is standard operating procedure of the St. Paul Police Department to make warrantless in-the-home arrests and that the police give virtually no consideration to the Supreme Court's holding in *Payton.* This deeply troubles us. However, as an appellate court we are bound by the specific and concrete facts presented to us. We cannot deal in the abstract. In these circumstances, there is simply not enough evidence in the record for us to conclude that the St. Paul Police Department is engaging in such a procedure on a regular basis. Suffice it to say that we will not fail to condemn such a procedure if and when a specific fact pattern in a case calls for it.

Briley next contends that the police lacked probable cause to arrest him. Probable cause to make a warrantless arrest exists where, considering the totality of the circumstances, the police possess reasonably trustworthy information which would warrant a prudent person in believing that the suspect had committed an offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–226, 13 L.Ed.2d 142 (1964); *United States v. Wallraff,* 705 F.2d 980, 990 (8th Cir.1983). Probable cause is based on the collective knowledge of all the officers involved. *United States v. Rose,* 541 F.2d

**2.** Briley also contends that when the police arrested him, they went beyond the scope of consent offered by Rivera. We disagree. To adopt Briley's argument would be to say that the police may never validly arrest a person in his or her home based on consent unless the officers specifically ask for permission to enter to arrest the suspect. Such a result cannot be squared with *Payton* since *Payton* clearly implies that a consensual entry will justify a warrantless in-home arrest. The *Payton* Court's primary concern was with the inviolability of a person's home and a warrantless *entry.*

750, 756 (8th Cir.1976), *cert. denied,* 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977). In dealing with probable cause we must necessarily recognize that it is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). The district court's finding that the police had probable cause to make a warrantless arrest of Briley must be upheld unless it is clearly erroneous. *Wallraff,* 705 F.2d at 990.

■■■■ We do not believe the district court's finding is clearly erroneous. The district court found that probable cause was partially established by the anonymous tip received from Crimestoppers. An anonymous tip from an informer may serve as a basis for probable cause as long as its reliability is established through corroboration.[3] *See United States v. McGlynn,* 671 F.2d 1140, 1145 (8th Cir.1982). Here, the caller said that a person named "Reiley" had robbed the bank and that the robber could be found at Apartment 13, 1635 Sherburn. The caller also said that a red dye explosive had gone off at the time of the robbery. This is significant since one of the tellers had told the police that she had put an explosive pack in the robber's knapsack and that she saw the pack go off with its accompanying red dye as the robber fled. Therefore, the tip was corroborated. We also note that "[w]e here deal with a citizen informant with no [known] motive to falsify, rather than a professional informant, with attendant credibility concerns." *United States v. Ross,* 713 F.2d 389, 393 (8th Cir.1983). In addition, Agent Conway observed that Briley fit the description the tellers gave of the robber. One of the tellers had noted that the robber had a scar near his right eye. Agent Conway observed that Briley had a similar scar. Finally, the police also had two tentative photo identifications. While none of these facts alone may establish the requisite cause to arrest, taken together and viewed in a common-sense fashion, all of the facts establish reasonable grounds to believe Briley committed the robbery. We therefore uphold the district court's finding of probable cause.

Briley's final contention is that the identification procedures utilized here were impermissibly suggestive in that (1) he was the only black person with tight curly hair who appeared in the photospread and the lineup; and (2) he was the only person who appeared in both the photospread and the lineup.

■■■■ The test for determining whether identification procedures are unduly suggestive is a two step inquiry. The first question is whether the procedures were suggestive while the second inquiry is whether, considering the totality of the circumstances, the suggestive procedures gave rise to a substantial likelihood of irreparable misidentification. *See Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972–1973, 18 L.Ed.2d 1199 (1967); *United States v. Amrine,* 724 F.2d 84 (8th Cir.1983); *United States v. Hadley,* 671 F.2d 1112, 1115 (8th Cir.1982). In determining whether an identification procedure violates due process, the primary focus is on the reliability of the identification. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *United States v. Hardesty,* 706 F.2d 859, 860 (8th Cir.1983).

■■■■ We cannot conclude that the identification procedures utilized here were fatally suggestive. After viewing both the photospread and the picture of the lineup, we find that Briley's complexion fairly resembles that of the other subjects regardless of their race. Although Briley is black or mulatto, he is very light skinned. His skin color appears no darker, and in some instances lighter, than others in the photo array and the lineup. In addition, we do not believe that the fact that Briley was the only person displayed in both the photosp-

---

**3.** The *Aguilar-Spinelli* test for determining the reliability of an informant's tip has now been largely discarded in favor of a totality of the circumstances approach. *See Illinois v. Gates,* 103 S.Ct. at 2332. This is a "practical, common-sense" and "non-technical" determination. *Id.*

read and the lineup makes the identification procedures per se suggestive. This is but one factor to consider.

In any event, the procedures utilized did not result in a "substantial likelihood of irreparable misidentification." *Stovall,* 388 U.S. at 301–02, 87 S.Ct. at 1972. Both tellers had an adequate opportunity to view the robber and listen to his voice. The bank was well lighted and although the robber wore sunglasses and a hat, the witnesses did observe him well enough to describe his height, build, hair color, complexion, and to note that he had a scar under his right eye. The tellers selected Briley from the lineup based primarily on his voice, build, and the facial scar. We agree with the government that since none of these features could be seen in the photospread, it appears the line-up selections reflect the tellers' memory of the robbery and not their memory of the photospread. We therefore conclude that the identifications were reliable.

In conclusion, we believe that Briley's warrantless arrest was proper, that the police had sufficient cause to make the arrest, and that the identification procedures were not so suggestive as to violate due process. The judgment of the district court is affirmed.