Johnny B. HUNT, Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 71A03–8906–CR–267.

Court of Appeals of Indiana,
Third District.

March 8, 1990.

Susan K. Carpenter, Public Defender, Kathleen A. Leseur, Deputy Public Defender, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Danielle Sheff, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

Johnny B. Hunt (Hunt) appeals from his conviction following a jury trial for murder and class C robbery. Hunt was sentenced to fifty years on the murder charge and eight years for robbery with such sentences to be served consecutively. We affirm.

## ISSUES

Hunt presents five issues for our review which we restate as follows:

(1) Whether the trial court erred in denying Hunt's motion to suppress his statement as given to the police on the grounds that (a) his warrantless arrest in the house where he resided as ordered by the prosecutor's office was in violation of the fourth amendment, (b) he demanded counsel when arrested but was never given the opportunity to consult therewith prior to questioning, or (c) the waiver of his right to silence and counsel was not knowingly, intelligently, or voluntarily made as he is educationally limited and functionally illiterate;

(2) Whether the trial court erred in overruling Hunt's relevancy objection to testimony that (a) Hunt had possession of the murder weapon more than a month prior to the crime and (b) that Hunt had previously expressed a willingness to hurt or kill if necessary;

(3) Whether the trial court erred in refusing to read to the jury Hunt's final instruction number five concerning the matter of reasonable doubt as to an essential element of the crime arising from evidence of subsidiary facts;

(4) Whether the jury's written question to the court during deliberation concerning the distinction between armed robbery as charged and a class C robbery as submitted to the jury indicated that the jury was considering matters not submitted to it such that the trial court should have ordered a new trial; and

(5) Whether the trial court's imposition of enhanced and consecutive sentences was manifestly unreasonable and not supported by the record.

## FACTS

The facts supporting the jury's verdict show that in the early morning hours of August 7, 1983 Gregory White and his friend Peter Davis were sitting along the retaining wall which surrounds the island in South Bend's Leeper Park. White and Davis were drinking beer and snorting cocaine. Hunt, a 23 year old black man, and a juvenile white male named Lee Eddy approached White and Davis from behind. After engaging in casual conversion with the two, Hunt demanded that White and Davis give up their money. Hunt held a

gun to the back of Davis' head and forced him to lie down. Eddy held something, later believed to be an unopened lockblade knife, to White's neck. After the victims surrendered their wallets, Eddy pushed White off the wall and Hunt killed Davis with a single-shot muzzle loading pistol. White crouched along the retaining wall until Hunt and Eddy left. Because it was so dark, White could not identify the assailants beyond noting that one was black and the other was white.

The record is unclear as to how the police first came to focus their attention upon Eddy. Nonetheless, Eddy's August 8, 1983 statement to police implicated Hunt. The police acquired the gun and White and Davis' wallets when the SBPD's Sergeant Bassell accompanied Eddy and his father to the home of Feliz Vasquez. Hunt and Eddy had gone to Vasquez's house after the crime. Carol Horning let Hunt and Eddy into the Vasquez home that morning and gave them the bag into which the items were placed. Horning testified that Hunt then told her that they had just shot a man. Horning also testified that Hunt and Eddy were laughing and bragging about the crime.

Based on White's and Eddy's statements and the items recovered from the Vasquez home, the prosecutor's office instructed the SBPD's homicide officers to detain Hunt for questioning. In the late evening hours of August 8, 1983, five SBPD officers met at the Sanders residence at 121 Elm Street. Hunt had been living there with Loretta Sanders for two to three months. The evidence presented at the suppression hearing is in conflict as to the events that took place near and in the Sanders residence.

Three SBPD officers testified that, after knocking and asking to be invited in by Sanders, they arrested Hunt and removed him from the house. The Sanders house was full of people that evening with several of the adults either consuming alcohol or smoking marijuana. Sanders testified that she first encountered the officers while outside the house and that they followed her into the home. Sanders' sister, Georgetta, testified that Loretta was outside

when the police arrived and they followed her back inside. Georgetta's husband, Cephus Phillips, testified along with Hunt that at the time of the arrest Hunt said "Get me a lawyer" without addressing that comment to anyone in particular. The officers testified that they heard no such request.

Hunt was taken to the police station for questioning. There he signed a rights waiver form and a statement as prepared allegedly from Hunt's own words. In this statement, Hunt characterizes the killing as one of self defense. Hunt claimed later that he believed the document he signed (on each page) was not a statement but rather a property inventory sheet completed as part of the booking process. Everyone is in agreement that Hunt cannot read very well. Hunt claims he made no statement to the police. The circumstances surrounding the taking of that statement were the focus of Hunt's unsuccessful suppression motion.

Hunt's case went to trial. Eddy did not testify despite the fact that he had previously been found guilty of various crimes for his participation in this matter. The jury returned a guilty verdict and the court ordered Hunt to serve consecutive sentences of fifty years for the murder of Peter Davis and eight years for the robbery of Gregory White. Hunt's motion to correct errors was denied; however, Hunt did not then perfect a timely direct appeal. On June 29, 1989 this court granted Hunt's petition to file a belated appeal.

*Issue I: The Motion to Suppress Hunt's Statement.*

As noted above, Hunt's argument on appeal concerning the denial of his motion to suppress has three aspects. We address each in turn.

a. Illegal arrest.

 Hunt argues that his arrest was illegally conducted, so the statement he gave police was inadmissible "fruit of the poisonous tree." We disagree. Hunt's arrest was within the dictates of the fourth amendment. Regardless of whether Hunt

was initially so informed or not, he was under arrest when he was frisked and removed from the Sanders home. *See Phillips v. State* (1986), Ind., 492 N.E.2d 10. However, that arrest, though warrantless, was permissible as the officers, particularly Homicide Detective Darrell Grabner, had both probable cause to believe that Hunt had committed a felony and the consent of the owner/possessor to enter those premises.

■ Even if Hunt had a legitimate expectation of privacy in the Sanders residence so as to raise a fourth amendment challenge to his arrest, *see Burris v. State* (1984), Ind., 465 N.E.2d 171, 182–83; *Rakas v. Illinois* (1978), 439 U.S. 128, 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 400, we find that Sanders' consent to the officers' entry is sufficient to overcome Hunt's fourth amendment claim.[1] That is, the holding in *Payton v. New York* (1980), 445 U.S. 573, 584, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639, 649, with respect to a warrantless entry into a suspect's home is not controlling here because, as Justice Stevens' majority opinion specifically pointed out, in *Payton* the court was "dealing with entries into homes made without the consent of any occupant." Here the facts, although disputed, support to the requisite level of proof the trial court's conclusion that Loretta Sanders voluntarily consented to the entry of the police officers, one of whom was in uniform. The consent to the entry of a suspect's home by police officers as given by even an unrelated co-occupant is sufficient to overcome the accused's fourth amendment claim. *See* 2 LaFave, *Search and Seizure* § 6.1(c), 582, n. 81. *See also United States v. Briley* (8th Cir.1984), 726 F.2d 1301 (occupant of apartment, defendant's girl friend, consented to the entry); *State v. Gerlaugh* (1982), 134 Ariz. 164, 654 P.2d 800, *opinion supplemented* 135 Ariz. 89, 659 P.2d 642 (another occupant invited police in); *People v. Adams* (1980), 91 Ill. App.3d 1059, 47 Ill.Dec. 605, 415 N.E.2d 610 (another tenant admitted the police);

*State v. Ferguson* (Mo.1981), 624 S.W.2d 840 (consent by co-occupant); *Feaster v. State* (Okl.Crim.App.1981), 635 P.2d 617 (consent by co-occupant).

b. Hunt's alleged demand for counsel.

■ The second rationale Hunt offers for labelling as error the trial court's refusal to suppress his statement arises from his claim that he requested counsel at the time of his arrest. Consequently, Hunt argues, because he was questioned before being provided counsel, the statement he gave police is inadmissible on the grounds that such questioning violated his rights under the fifth and sixth amendments.

However, Hunt misses the point. The analysis he offers us would be applicable if it was established that he had in fact demanded counsel when he was arrested. As the matter sits before us, the issue is whether the record supports the trial court's conclusion that Hunt either did not demand that he be given counsel or that the officers did not hear that demand. That is, on appeal from the denial of a motion to suppress, the question is one of the sufficiency of the evidence, so we merely look at the evidence most favorable to the trial court's ruling to determine whether it supports that ruling. *See Zimmerman v. State* (1984), Ind.App., 469 N.E.2d 11, 13. The record suggests that the Sanders household was a difficult place to effectuate this arrest. At least eight individuals lived at that address. On the night in question at least thirteen people were present including six adults and seven children. Several of the adults had been drinking beer or smoking marijuana. We may easily surmise the confusion when the three SBPD police officers entered the house to make the arrest. All three officers testified that they did not hear Hunt request counsel. The only people who testified otherwise were Hunt and Cephus

---

**1.** In so finding we do not rely, as the state has in its brief, upon *Underwood v. State* (1984), Ind., 535 N.E.2d 507, for on its facts, *Underwood* is inapplicable. In *Underwood* the state correctly

asserted that the defendant had no standing to present a fourth amendment claim because the record did not show that he lived with his father, the person who consented to the search.

Phillips,[2] and even their testimony indicates that if Hunt said anything about counsel it was not directed toward the officers. As such, the officers very well might not have heard this alleged demand for an attorney. We find no error in the trial court's conclusion that Hunt either did not request counsel or did not convey that request to these officers. Consequently, we need not address Hunt's argument that he was unconstitutionally subjected to custodial interrogation prior to consulting with an attorney.

c. Voluntariness of his statement.

■ As our supreme court observed in *Mitchell v. State* (1983), Ind., 454 N.E.2d 395, 397:

As a court of review, we review the question of the admissibility of a confession as we do other sufficiency matters. We do not weigh the evidence, but rather determine whether there was substantial evidence of probative value to support the trial court's finding. This is true even though conflicting evidence is presented on the issue of voluntariness. It is well settled that it is the state's burden to prove, beyond a reasonable doubt, that the defendant voluntarily and intelligently waived his rights, and that the confession was voluntarily given. In considering whether such burden was satisfied we look at the totality of the circumstances, to determine whether there had been any inducement by way of violence, threats, promises, or other improper influence. [citations omitted]

*See also Nichols v. State* (1989), Ind.App., 542 N.E.2d 572, 574.

Hunt was advised of his rights as protected by the *Miranda* procedure and he signed a rights waiver form (R. p. 751). Of course, a defendant's signature on a waiver form by itself is insufficient to prove that an accused understood his rights. *See Dickerson v. State* (1971), 257 Ind. 562, 276 N.E.2d 845. Hunt even alleges that he was tricked into signing the typed statement as he was led to believe it was a property

inventory sheet. He claims to have given no statement at all.

The officers testified that Hunt had difficulty reading. They read the waiver form to him and explained it. We find only his testimony to support his contention that a battery of officers hurled question upon question at him. Those officers testified otherwise and stated that Hunt was even offered an opportunity to correct the statement that was prepared for and read back to him. From our review of the suppression hearing transcript it is apparent that Hunt has sufficient verbal skills and cognitive ability, when he chooses to exercise it, to warrant the trial court's conclusion that Hunt had a sufficient understanding of his rights to silence and to the assistance of counsel. The statement was properly admitted into evidence.

*Issue II: Relevancy Objection.*

■ Hunt complains that the trial court erred by allowing into evidence over objection the testimony of Eddy's former girlfriend, Laura O'Hara, that Hunt and Eddy were friends (in fact "blood brothers"), that she had on several occasions seen Hunt in possession of the murder weapon, and that Hunt had said as part of the blood brother pact that "if he had to hurt someone or kill somebody he would." Hunt contends that the factual bases for that testimony were too remote from the commission of the crime, and thus, this testimony served only to present Hunt in a negative light.

On the issue of relevancy objections, our supreme court has recently reiterated the standard of review:

The trial court is accorded wide latitude in ruling on the relevance of evidence.... This latitude is vested in the trial court to determine the probative value of evidence in relation to its prejudicial impact. If the offered evidence is only marginally relevant, it is within the sound discretion of the trial court to de-

---

**2.** We note that it was Cephus Phillips alone who testified that at least one of the officers entered the home with weapon drawn.

termine its admissibility. [citations omitted]

*Tiller v. State* (1989), Ind., 541 N.E.2d 885, 891. Due to conflicting evidence as to ownership of the gun and the relationship between Hunt and Eddy, we concur with the trial court's decision to allow the jury to hear that testimony. However, the trial court's decision to admit O'Hara's testimony regarding Hunt's willingness to hurt or kill is more troubling. The trial court was itself convinced that the killing was unnecessary to carry out the uncontested robbery, so the blood brother oath to hurt or kill if the need be does not tie in to the facts of the crime. Nonetheless, we are not persuaded that the possibly erroneous admission of this evidence warrants reversal. While the admission of irrelevant evidence is sometimes presumed to be prejudicial, an examination of the whole record that reveals overwhelming evidence of the defendant's guilt will rebut any such presumption. *Parker v. State* (1986), Ind. App., 501 N.E.2d 1131, 1136. That is the case here. Hunt's guilt was clear irrespective of O'Hara's testimony regarding the pact.

### Issue III: Reasonable Doubt Instruction.

■ Hunt's next assertion of error concerns the trial court's denial of his tendered instruction on reasonable doubt. Hunt's instruction reads as follows:

Reasonable doubt refers to the essential elements of the crime charged. However, a reasonable doubt as to the existence of an essential element may arise from any of the evidence introduced including not just evidence directly related to the essential element but also evidence of subsidiary matters. [R. 77]

Hunt argues, based upon *White v. State* (1955), 234 Ind. 209, 125 N.E.2d 705, that the substance of the tendered instruction was not covered by any other instructions and was critical to balance the court's instruction number four in which the jury was cautioned against merely speculative doubts.

"Jury instructions lie largely within the trial court's discretion." *Jewell v. State* (1989), Ind., 539 N.E.2d 959, 961. It is not error for the court to refuse a tendered instruction when its substance is covered by other instructions given to the jury. *Russelburg v. State* (1988), Ind., 529 N.E.2d 1193, 1196. Here the trial court's instructions were the usual and customary instructions read to juries on the matter of reasonable doubt. Moreover, we note that a trial court is not obligated to give an instruction that is confusing. *Hare v. State* (1984), Ind., 467 N.E.2d 7, 16. Contrary to Hunt's contention, the supreme court did not in *White* embrace the sort of instruction he offered; rather, that court noted the confusion and ambiguity associated with the term "subsidiary evidence." *White, supra,* 234 Ind. at 213–214, 125 N.E.2d at 706. The trial court's instructions regarding reasonable doubt were not erroneous.

### Issue IV: Jury Misconduct.

■ Just prior to returning with a verdict, the jury sent a written question to the trial judge concerning the difference between class C robbery and armed robbery. They apparently desired to clear up the confusion brought about by the fact that while Hunt was initially charged, via a theory of accomplice liability, with class B robbery, which is akin to armed robbery, the jury was instructed only as to the offense of robbery in its class C (unarmed) form. *See* IC 35–42–5–1 and IC 35–41–2–4. The trial judge did not answer the question. Instead, she, after consulting with the attorneys on the record, wrote back to the jury telling them to choose from the verdict forms provided.

Hunt seeks to characterize the fact that the jury asked this question as evidence that its sympathy for the victim caused it to consider facts and crimes not presented to it in the charge, evidence, or instructions. On these grounds, Hunt now claims that the trial court should have exercised its authority to act as the thirteenth juror and ordered a new trial.

First, we point out that Hunt's trial counsel failed to address this matter during the trial. Hunt first raised this issue in his motion to correct errors, so we are inclined

to rule that he failed to preserve his claim for review. Nonetheless, we reject Hunt's characterization of the jury's motives in forwarding this question. During the trial Eddy refused, despite a contempt citation, to testify under an asserted belief that he had a fifth amendment right to silence notwithstanding his conviction in this matter. Without evidence that Eddy possessed the knife at the time of the robbery, the trial court apparently concluded that Hunt could only be guilty of a class C felony and granted judgment on the evidence as to the class B allegation. Having been preliminarily instructed on armed robbery, the jury's confusion is understandable. We see no evidence of misconduct in the jury asking this question. It is not contended that the court's response was improper.

*Issue V: Sentencing.*

Lastly, Hunt challenges the imposition of enhanced consecutive sentences as manifestly unreasonable and not supported by the record.

 Sentence enhancement and imposition of consecutive sentences are separate and discrete decisions for the court and the reasons for each must be stated. *Lindsey v. State* (1985), Ind., 485 N.E.2d 102, 108. On the other hand, the same reasons may be used to justify both an aggravated sentence and consecutive sentences. *Chambers v. State* (1985), Ind., 478 N.E.2d 1234, 1235.

 While merely stating the conclusory language of the statute is insufficient, the statement of the court's reasons is adequate so long as the record clearly discloses the factual basis for the court's determination. Furthermore, where the record shows that the trial judge engaged in the evaluative processes but did not sufficiently articulate the reasons for enhancement and the record indicates that the sentence imposed was not manifestly unreasonable, then the purposes of the specificity requirement have been met. *Henderson v. State* (1986), Ind., 489 N.E.2d 68, 72.

 Here the trial judge's sentencing statement shows that she engaged in the evaluative process in considering the enhancement of each offense and the determination to impose consecutive sentences.

The court found the only mitigating factor was that Hunt had no prior serious record. As aggravation the court noted the needlessness of the homicide since the victims cooperated and could not identify the robbers. It also noted the callousness of the crime and Hunt's laughing and bragging about the killing and going tubing later in the morning of the killing. These facts more than sustain the court's conclusions that Hunt was in need of incarceration and that standard and concurrent sentences would depreciate the seriousness of the offense. Moreover, we cannot say that no reasonable person could find the sentence appropriate.

Affirmed.

STATON and SULLIVAN, JJ., concur.