UNITED STATES of America,
Plaintiff,

v.

James E. FALER, Defendant.

No. 3:14–cr–00021–JEG

United States District Court,
S.D. Iowa, Davenport Division.

Signed 04/28/2015

Clifford R. Cronk, III, United States Attorney's Office, Davenport, IA, Maureen McGuire, United States Attorney's Office, Des Moines, IA, for Plaintiff.

## ORDER

JAMES E. GRITZNER, Senior Judge

This matter comes before the Court on Motion to Suppress, ECF No. 43, by James E. Faler (Defendant). The Government resists. The Court held a hearing on the motion on March 26, 2015. Assistant U.S. Attorney Clifford R. Cronk III repre-

sented the Government. Attorney John L. Lane represented Defendant. Both parties filed supplemental briefs on April 10, 2015. The motion is fully submitted and ready for disposition.

## I. BACKGROUND

On May 31, 2013, Autumn Centers, a leasing consultant for an apartment complex in Louisville, Kentucky, called 911 to report suspicious activity. Centers told the 911 operator that someone, later identified as Defendant, had been staying at the apartment complex in another resident's unit. She reported he had been "messing with the little kids that live around here" and that his conduct was "awfully weird." Def. Ex. 1–B. She asserted that Defendant took a child into his apartment and a resident had a picture of him "touching a little girl." Id. Centers told the dispatcher said she had done research on the Internet and determined Defendant had been convicted of sex offenses in Iowa and was a registered sex offender.[1] Centers asserted that Defendant was not presently causing any trouble, but he had been "standing with a bunch of kids," and it was "scary." Id.

Three uniformed polices officers, Mary Imber, Jonathan Noe, and Jay Moss, promptly responded to Centers' call.[2] The officers located Centers and verified the information she told the dispatcher. According to Officer Noe's testimony, the officers then checked an electronic database to confirm that Defendant was on the Iowa sex offender registry. The officers

---

**1.** The Government alleges Defendant has a lengthy history of convictions for sexually abusing minors. The Government also describes allegations of similar conduct that did not result in a conviction. At the hearing on his motion, Defendant initially testified he had been convicted of two courts of third degree sexual assault. On cross-examination, Defendant agreed he was convicted of two courts of sexual abuse in 1991 and two counts of sexual abuse in 1994.

**2.** At this time, Officer Noe was in training and Officer Moss was his training officer. Imber was a patrol officer on the date of the incident and is now a detective.

then proceeded to a unit leased to Michael Parks and knocked on the door.

There are conflicting accounts of what happened next. In a recorded interview with an investigator from a public defender's office, Parks said the officers came to the door and "kind of pushed their way through" and "just walked in." Def. Ex. 3. Parks told the investigator he did not say anything to the officers when they entered. Id. Parks testified before the Grand Jury in this matter, "They knocked on the door. I answered. They asked if I knew [Defendant]. I said, 'yes.' They asked if [Defendant] was here. I said, 'yes,' and started pointing to the room. By that time [Defendant] had come out to meet them." Parks Grand Jury Tr., Def. Ex. 11.

Officer Noe testified at the hearing on Defendant's motion that Parks came to the door and initially denied Defendant was in his apartment. According to Officer Noe, the police continued to question Parks and then Defendant stepped out of a back room and into view of the officers. Officer Noe testified that he could not recall the "exact wording" he used, but he said that his training would have made it "second nature" to ask " 'can we come in' or 'can we talk to you' or, 'hey, do you mind if I speak to you' " before entering the room. Hr'g Tr. 16, ECF No. 55. Officer Noe continued that he used one of these phrases, and the officers entered the room. He also testified that Parks had been standing in the doorway and he turned around and "kind of pointed towards Mr. Faler" and stepped out of the way. Id. Officer Noe further explained that Parks gestured to

indicate that Defendant was "back there, there he is." Id. at 38.

Officer Moss testified that he instructed Officer Noe to knock on Parks' door and take the lead because he "wanted him to get the experience of gaining access to an apartment and talking to people." Id. at 45. Officer Moss also testified that Parks initially hesitated but then said he knew Defendant. At that time, Defendant came into view. Officer Moss testified, "Officer Noe says, mind if we come in? [Parks] opens the door, moves out of the way, and we entered and had a conversation with Mr. Faler from there." Id. at 46. Officer Moss testified that Parks did not object in any way. Officer Moss also testified that Parks stepped out of the way, but he did not make any other gesture.

Officer Imber testified that she was too far back in the hallway to hear any conversation between Parks and Officers Noe and Moss at the door. She also testified she was unable to see any gestures Parks made.

Defendant testified that he heard a knock on the door and heard Parks answer. He heard his name mentioned, and he came forward. Defendant testified that he was able to hear the officers' conversation with Parks, and he did not hear them ask for consent to enter. Parks offered when the officers saw him, "they stepped in." Id. at 66.

Officer Noe testified that after the police entered the apartment, they questioned Defendant and eventually placed him in handcuffs.[3] Officers Noe and Moss testified

---

**3.** Officer Noe testified that, in violation of his training, he did not read Defendant his Miranda rights. Officer Moss testified he read Defendant his rights at some point, but he could not remember when. He thought Officer Noe probably read Defendant his rights while he was questioned in Parks' apartment. While this apparent failure to read Defendant

his Miranda rights while he was in custody in Parks' apartment and subject to interrogation is troubling, it is not directly relevant to the present motion as Defendant is not seeking to suppress any statements he made to the police during the interrogation. See United States v. Patane, 542 U.S. 630, 643, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (holding the

that they did not search the apartment at this time, but Moss performed a protective sweep to ensure no one else was in the apartment. Officer Noe testified he remained with Defendant in the main room. Officer Noe reported that Defendant and Parks were very polite and cooperative during their entire encounter with the police.

In contrast, Defendant testified that Officer Moss remained with Defendant and that Officer Noe started looking through the room where he was staying. Defendant continued that Officer Noe returned to the main room and said, "I have something you need to see." Id. at 68. According to Defendant, the officers decided to arrest him after Officer Noe returned from the back room.

Each officer and Defendant testified that Imber left to make some calls and confirm Defendant had violated his registration obligations. Officers Noe and Moss testified the officers arrested Defendant once Imber confirmed Defendant had failed to register as required.

Officer Noe testified he guided Defendant to the police cruiser. On the way, Noe reports that Defendant asked Officer Moss to retrieve his backpack from the apartment because he had several medications he would like to take with him as he was planning to go back to Iowa after his release from jail. Officer Noe testified that Officer Moss helped him secure Defendant in the cruiser and then returned to retrieve the backpack.

Likewise, Officer Moss testified that after the officers left the apartment with Defendant and as they were walking down the hallway, Defendant told Moss he needed his medicine. Officer Moss testified that he said to Defendant, " '[W]here's your medicine?' and [Defendant] said, 'in my backpack.' 'Where's your backpack?' 'In the bedroom.' " Id. at 48. Officer Moss explained that he returned to retrieve the backpack after placing Defendant in the police car. He asked Parks where the backpack was, and Parks told him it was in the room where Defendant was staying. Officer Moss reported he saw the backpack in plain view. He testified Louisville police policy requires officers to examine items before putting them in police cars, so he looked in the backpack to ensure nothing inside would jeopardize officer safety.[4] Officer Moss testified that he found in the backpack images of the Defendant "with little boys in compromising positions." Id. at 49. Officer Moss then called his sergeant and asked him to come to the scene.

Detective Imber testified that the officers had not conducted a search or found contraband prior to Defendant's arrest. She testified she first saw the backpack when Officer Moss showed it to her after Defendant was by the car or "being placed in the car." Id. at 78.

Parks testified before the Grand Jury that after the officers took Defendant to the car, one officer returned and took the backpack. Parks testified that after that, a fourth officer came in and requested to search the remainder of the apartment. The officers took electronic equipment from the room where Defendant was staying.

Defendant testified on direct examination that on the way to the police cruiser,

exclusionary rule does not apply to physical evidence obtained as a result of a Miranda violation).

4. Officer Noe also testified that it is "standard procedure" to search personal property the police take with them, because the officers do not know if "there are guns, explosives, drugs, [or] anything of that nature" and there are strict rules about what inmates can store in the jail's property room. Id. at 25.

he asked the officers to leave his keys with Parks so he could take care of Defendant's things and his car. On cross-examination, Defendant testified he did not ask for his backpack. Rather, he asserts that while they were escorting him to the cruiser he asked for the police to get his medications. Defendant testified his medications were on the kitchen counter. He acknowledged some medications may also have been in his backpack, but he was "not sure how [the police] got them." Id. at 72. Defendant then testified that he specified that he asked for the medications on the counter and not the medications in his backpack. However, the record demonstrates Officer Moss made no effort to enter the kitchen and rather proceeded directly to the backpack following the Defendant's request for his medications.

The policed logged Defendant's backpack into evidence at the police station. Months later, on December 12, 2013, Louisville police detective Shawn Hamilton applied for and obtained a warrant to search, inter alia, a Dell laptop computer found within the backpack and "any other paper documents or items that might contain digital evidence." Def. Ex. 6, ECF No. 43–5. The Government asserts the detective found pictures of young boys on the Dell laptop, but they were not child por-

nography. Detective Hamilton later found a sixteen gigabyte thumb drive in the backpack. On it, he allegedly found videos and images of Defendant sexually abusing children. The police determined the children were from Iowa. Based on this evidence, Defendant was arrested again.

On April 23, 2014, a federal Grand Jury returned a ten-count Indictment against Defendant. The Indictment charges Defendant with repeatedly producing child pornography in violation of 18 U.S.C. §§ 2251(a), (e), and 3559(e), and alleges the applicability of the 18 U.S.C. § 2260A enhancement because Defendant was required by law to register as a sex offender at the time he committed a felony involving a minor in violation of § 2251.

## II. DISCUSSION

Defendant's central argument is that neither Parks nor Defendant gave their consent to the police to enter Parks' apartment.[5] Defendant argues that the Fourth Amendment requires the exclusion of the items discovered in Defendant's backpack because they are the fruit of a poisonous tree. Defendant observes that no witnesses testified that Parks gave verbal consent for the police to enter. Defendant notes that Officers Noe and Moss did not indi-

---

**5.** Defendant also argues that the police could have obtained a warrant based on the information they learned from Centers, but instead they proceeded to Parks' apartment intending to arrest Defendant. Officer Noe testified he did not think police had enough information to arrest Defendant until they questioned him and Officer Imber conducted additional investigation. Ultimately, if the police obtained consent to enter the apartment and they had probable cause to arrest Defendant, the officers' subjective intent is irrelevant. Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1858, 179 L.Ed.2d 865 (2011) ("If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent.").

Especially given Centers' allegations that Defendant was acting inappropriately around children, it is also irrelevant if the officers knew they could have obtained a warrant to arrest Defendant, but they decided to seek his consent to a search or to submit to questioning in order to gain additional evidence against him. See id. at 1859 (noting the Supreme Court has "never held, outside limited contexts such as an 'inventory search or administrative inspection ... that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" (quoting Whren v. United States, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996))).

cate in their testimony before the Grand Jury, or at any prior time, that either of them obtained consent to enter the apartment. Defendant argues the Government has not met its burden to prove consent because the officers' testimony is inconsistent. Defendant argues Officer Noe testified that Parks gestured towards Defendant, and Officer Moss testified there was no gesture. Defendant also observes that Officer Noe testified he did not read Defendant his Miranda rights while he was in the apartment, and Officer Moss thought that Officer Noe did read Defendant his rights.

In addition, Defendant argues that even if Parks stepped aside when the officers saw Defendant, he did this to avoid getting "run over," not because he was consenting to the entry of the police. Defendant also contends that to the extent Parks made any gesture toward Defendant, this gesture was ambiguous and not indicative of his consent to the officers' entry.

■ "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (quotation marks and citation omitted); see also Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Yet, the presumption can be overcome in some circumstances. King, 131 S.Ct. at 1856. For example, "officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs." Id. at 1858; see also Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("[It is] well settled that one of the specifically established exceptions to the requirements of

both a warrant and probable cause is a search that is conducted pursuant to consent."). A "valid and voluntary consent may be followed by a warrantless in-home arrest" or a search. United States v. Briley, 726 F.2d 1301, 1303 (8th Cir. 1984).

■ Here, the Government argues Parks consented to the search of his apartment before the officers entered.[6] "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given." United States v. Aguilar, 743 F.3d 1144, 1147 (8th Cir. 2014) (citation omitted).

■ A resident's consent to a search can be implied. See United States v. Mendoza, 677 F.3d 822, 829 (8th Cir. 2012) (finding the defendant's "gestures and body language indicated his consent"). Yet, merely opening a door to police is not consent for the police to enter. See Payton, 445 U.S. at 578, 603, 100 S.Ct. 1371 (finding the fact that the defendant's three-year old son opened the door to police so that the police could see the defendant sitting in a bed inside insufficient to justify the officers' entry without a warrant). Moreover, mere acquiescence to police authority is not consent. Mendoza, 677 F.3d at 822; United States v. Poe, 462 F.3d 997, 1000 (8th Cir. 2006) (holding that the defendant's decision to open his door after the police had been knocking for ten minutes and commanding him to answer was not implied consent).

The Eighth Circuit has accepted that opening the door to police and then turning to enter the house constitutes implied consent for the police to follow. United States v. Hampton, 260 F.3d 832, 833 (8th Cir. 2001). In Hampton, the Circuit em-

6. The Government conceded the evidence does not support a finding of exigent circum-

stances in this case.

phasized there was "a complete lack of evidence tending to show any use of force, coercion, or deception by police," rather the evidence indicated the defendant "literally opened the door to admit the [police] into his home." Id. at 835. In addition, the Eighth Circuit's decision in United States v. Briley has facts somewhat similar to the present case. Briley, 726 F.2d at 1303. Officers investigating a bank robbery went to a residence to see if they could locate a suspect. Id. The officers encountered a woman who said she was the suspect's girlfriend, but she did not know where the suspect was. Id. As the officers were about to leave, she said, "All right, he's in my apartment. Come with me." Id. She then led the officers to her apartment, "opened the door and gestured with her hand at [the Defendant], who was standing in the apartment." Id. The court found the police had valid consent to enter. Id. at 1304.

 On this record, the Court finds the more credible evidence is that some verbal request to enter from Officer Noe occurred with or without a verbal response from Parks; however, the Court is not tethered to that finding alone because the Court finds the Government has shown by a preponderance of evidence that Parks implicitly consented to the officers' entry by gesturing towards Defendant and stepping aside as a gesture communicating consent to enter. Like in Hampton, there is no evidence here that the police gained entry by force, coercion, or deception. Rather, the officers testified that Parks and Defendant were cooperative and polite. Officer Noe repeatedly, clearly, and persuasively testified that while Parks was standing at the door, he pointed into the apartment toward Defendant. He also testified that Parks stepped out of the officers' way so as to permit them to enter. Parks' testimony before the Grand Jury is consistent with Officer Noe's recollection.

Parks testified he pointed towards the room where Defendant had been staying and by this time Defendant had come forward to meet the police. Although Officer Moss testified that Parks did not make any gesture other than stepping out of the doorway, Officer Moss' testimony is largely consistent with the account of Officer Noe and Parks in other respects. As Officer Noe was nearest to Parks and was best able to observe him, and Parks himself testified that he pointed toward Defendant, the Court finds that the Government has demonstrated that Parks pointed into the apartment and stepped aside in a manner that implicitly conveyed to the officers that they could enter. Because the officers' entry did not violate Defendant's Fourth Amendment rights, the Court cannot suppress the items found in the backpack as the fruit of a poisonous tree.

 Assuming *arguendo* the officers' entry into Parks' apartment was unlawful, the officers' seizure of Defendant's backpack was sufficiently attenuated from any illegality that the exclusionary rule does not apply. The Supreme Court has refused to adopt a per se rule excluding all evidence that would not have been obtained but for a constitutional violation. See United States v. Simpson, 439 F.3d 490, 495 (8th Cir. 2006) (citing United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)). Rather, "evidence obtained as the result of an unjustified search or arrest 'may be admissible if 'the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality.'" United States v. Faulkner, 636 F.3d 1009, 1015 (8th Cir. 2011) (quoting Simpson, 439 F.3d at 495 (quoting United States v. Crews, 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980))).

■ The Supreme Court has explained that the apt question when considering the attenuation doctrine is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting John MacArthur Maguire, Evidence of Guilt 221 (1959)). "Voluntary consent alone is not sufficient to avoid suppression based on the unlawful entry." United States v. Greer, 607 F.3d 559, 564 (8th Cir. 2010).

■ "When an illegal entry precedes a defendant's grant of consent to search, the Government must show (1) that the defendant's consent was voluntary and (2) that 'the consent was an independent act of [the defendant's] free will that purged the taint of the Fourth Amendment violation.'" United States v. Whisenton, 765 F.3d 938, 941 (8th Cir. 2014) (alteration in original) (quoting Greer, 607 F.3d at 564). When determining whether consent to search purges the taint of conduct that violated the Fourth Amendment, the Court is to consider "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the [officers'] Fourth Amendment violation." See id. (citation omitted). The Court is also to consider "the giving of Miranda warnings where applicable." Id. (quoting Greer, 607 F.3d at 564). This Court finds same factors are logically applicable to the determination of whether

consent to *seize* property purges the taint of a Fourth Amendment violation.

■ Turning to the first factor, "[t]he closer in time the illegal entry and the defendant's consent occurred, the more likely the illegal entry influenced the consent." Id. The Court is to measure "temporal proximity from the point 'at which the [agents' conduct] became illegal to the time of the consent.'" Id. (alteration in original) (quoting United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007). "Under [Eighth Circuit] precedent, fifteen minutes is sufficient to demonstrate an attenuation of the illegality." Id. at 942.

Here, the Court finds that Defendant voluntarily requested the police retrieve his backpack as the officers were escorting him to the patrol car.[7] The testimony of Officers Noe, Moss, and Imber on this point was clear, consistent, and persuasive. Parks' testimony before the Grand Jury also indicates that an officer returned to retrieve the backpack after the officers escorted Defendant to the car. This is entirely consistent with the officers' testimony that Defendant asked for the bag while they were removing him from the apartment. The Court finds that Defendant's assertion that he did not ask the officers to retrieve the backpack is not credible. Defendant's reply brief, which Defendant acknowledged he read, states that "[a]fter Mr. Faler was arrested, he asked to have the backpack brought along. ... There is no indication that the officers intended to seize or search the backpack before Mr. Faler asked for it." Def. Reply 6, ECF No. 48. This, along with the conflict between Defendant's testimony and the testimony of the other credible witnesses, directs the Court to accept the officers' testimony that

---

7. Although the Court finds Defendant voluntarily consented to the seizure of his backpack, there is no evidence that Defendant voluntarily consented to a search of his backpack. However, as discussed below, the Court finds Officer Moss conducted a lawful inventory search.

Defendant asked for the backpack after his arrest.

Defendant testified that he sat in the apartment for about forty-five minutes between the time of the officers' entry and his arrest. This is consistent with Officer Noe's testimony. He suggested the police placed Defendant under arrest around thirty minutes after they entered the apartment. Because at least fifteen minutes passed between the officers' entry and Defendant's request that the police retrieve his backpack, the first factor weighs in favor of finding attenuation.

Defendant's unsolicited request for the police to retrieve his backpack from the apartment is a very significant intervening circumstance. Courts have found a suspect's unsolicited request for police to search a location or an object may constitute an intervening circumstance. For example, in United States v. Montgomery, 777 F.3d 269, 275 (5th Cir. 2015), after the police placed the suspect under arrest in a manner the court assumed was unconstitutional, he "repeatedly requested that the officers access his cell phone" so they could remove "naked pictures" he did not want his father to see. Id. The officers, who were not previously interested in the phone, agreed to delete the pictures in exchange for information about the suspect's drug supplier. Id. at 271. When the officer looked at the pictures, however, he discovered they were child pornography. Id. The Fifth Circuit found "[t]hat unique intervening circumstance separates this particular act of consent from the doubtless more frequent occurrence: consent provided *after* an officer's request to conduct a search." Id. at 275.

Similarly, on multiple occasions, the Eighth Circuit has affirmed a district court's denial of a motion to suppress when the suspect provided consent to search a residence after the police entered his residence illegally. See Whisenton, 765 F.3d at 940–42 (finding attenuation when police entered a home with guns drawn without consent or a warrant, directed the defendant to sit on a couch as they conducted a protective sweep, and then later obtained consent to search); Greer, 607 F.3d at 564 (affirming finding that although officers entered the home unlawfully, the suspect's consent to search purged the taint because the officers' Fourth Amendment violation "was not especially flagrant," their "unlawful entry did not prompt the request to search," and the suspect's brother arrived after the police entered and the two contemplated whether to grant the police consent before deciding to do so).

Here, there is no credible evidence that the officers were even interested in Defendant's backpack before he initiated their attention. The officers did not pressure Defendant to allow them to search or seize the backpack. Rather, Defendant made the unsolicited request for the officers to retrieve it. This is an intervening circumstance that significantly interrupted any taint of the officers' entry. This factor weighs heavily against suppressing the evidence.

The Eighth Circuit has explained "[t]he purpose and flagrancy of the official misconduct is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." Simpson, 439 F.3d at 496. The exclusionary rule "does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." Id. (quoting United States v. Fazio, 914 F.2d 950, 958 (7th Cir. 1990)). Police conduct is purposeful and flagrant when "(1) the impropriety of the official's misconduct was obvious or the official

knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" Id. (quoting Brown v. Illinois, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

Even if unlawful, the officers' conduct in this case was not purposeful and flagrant. The officers testified they believed Parks expressly or impliedly consented to their entry into the apartment. Even if Parks did not consent, the officers did not force their way in. They simply walked into an open door to question someone they believed was in violation of sex offender registration laws and who they heard had been acting strangely around children. The officers' conduct in retrieving Defendant's backpack does not appear to have been investigatory in design or purpose. Rather, the officers retrieved it at Defendant's request. Accordingly, this third and most important factor weighs against suppressing the evidence.

Although the police failed to read Defendant his Miranda rights before he asked the officers to retrieve his backpack, in this case that factor does not undermine a finding of attenuation. There is no suggestion that Defendant's request was coerced. He initiated the request a sufficient time after the officers' entry and, although the officers should have read him his Miranda rights, their error appears to have been unintentional and not an attempt to obtain evidence against Defendant. Therefore, the Court must find the seizure of Defendant's backpack is sufficiently distinguishable from the officers' entry so that it is purged of any taint.

 A final issue is whether Officer Moss violated the Fourth Amendment by opening the backpack. The Government argues Officer Moss conducted a lawful inventory search. "Inventory searches are one exception to the general rule that searches conducted without a warrant are unreasonable." United States v. Smith, 715 F.3d 1110, 1117 (8th Cir. 2013). The Supreme Court has explained inventory searches are intended to serve "three distinct needs: the protection of the owner's property while it remains in police custody . . . the protection [of] the police against claims or disputes over lost or stolen property . . . and the protection of the police from potential danger." South Dakota v. Opperman, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (citations omitted). "An inventory search must 'be reasonable under the totality of the circumstances . . . and may not be a ruse for general rummaging in order to discover incriminating evidence.'" Smith, 715 F.3d at 1117 (alteration in original) (quoting United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011)). An inventory search is reasonable if it is "conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." Id. (quoting Taylor, 636 F.3d at 464).

Here, Officers Noe and Moss testified that Moss looked in Defendant's backpack prior to placing it in a patrol car pursuant to standard police procedures designed to protect officer safety. There is no indication the police opened the bag as a purposeful means to discover evidence. The facts of this case are somewhat different than a standard inventory search that occurs at a station house. Cf. Illinois v. Lafayette, 462 U.S. 640, 645, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). However, all of the rationales articulated in South Dakota v. Opperman, especially the protection of officer safety, are present here. Moreover, although the officers did not lawfully

search the bag incident to Defendant's arrest,[8] the rationales of the search incident to arrest doctrine are also equally applicable here. See United States v. Robinson, 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial."). Accordingly, after requesting the police to retrieve his bag and place it in the patrol car, Defendant did not have a reasonable expectation of privacy in the contents of the bag. Officer Moss could constitutionally inventory its contents.[9]

## III. CONCLUSION

For the reasons stated, Defendant's Motion to Suppress, ECF No. 43, must be **denied.**

**IT IS SO ORDERED.**

---

**8.** According to Detective Hamilton's search warrant affidavit, Officer Imber told him the bag was searched as a search incident to arrest. The Government acknowledges that the officers did not seize the backpack incident to Defendant's arrest. See Chimel v. California, 395 U.S. 752, 768, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (holding the search incident to arrest doctrine only allows officers to search the area within the arrestee's reach and the arrestee's person). The backpack was not within Defendant's reach at the time of his arrest.

**9.** Assuming *arguendo* opening the backpack at the scene was unconstitutional, the police would have inevitably discovered its contents. Officer Noe testified it is police procedure to inventory any items stored in the station house inventory room. The exclusionary rule does not apply "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Because the Government has established by the preponderance of evidence that the police would have inevitably inventoried Defendant's backpack at the station house, the exclusionary rule does not apply.