# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3215

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the Eastern |
| | * District of Missouri. |
| Adrian Minnis, also known as Bo, | * |
| | * |
| Appellant. | * |

_____

Submitted: May 17, 2007
Filed: July 5, 2007

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge,

Adrian Minnis pled guilty to three counts: (1) conspiracy to distribute and possess with the intent to distribute heroin, cocaine, and crack cocaine (Count 1); (2) possession with intent to distribute crack cocaine (Count 2); and (3) civil forfeiture in the amount of $25,340 (Count 13). Minnis now appeals claiming error in various pretrial rulings and sentencing decisions.

## I.     BACKGROUND

In 1990, the federal Drug Enforcement Agency (D.E.A.), St. Louis Metropolitan Police Department, and St. Louis County Police Department all began

investigating a large heroin and cocaine trafficking organization led by Adrian Minnis. From March 2004 until August 2004, the investigations utilized extensive electronic surveillance of telephone conversations (wiretaps) in addition to visual surveillance and controlled purchases of narcotics by both confidential sources and undercover agents.

Minnis was arrested on November 16, 2004. A thirteen-count superseding indictment against him and twenty co-defendants was filed on February 2, 2005. Minnis was charged in the three counts identified above. In January 2006, Minnis sent a letter to the court requesting a psychiatric evaluation, which was denied. Minnis pled guilty on March 31, 2006.

Following a two-day sentencing hearing, the district court[1] calculated Minnis' Guidelines base offense level as 36, added two levels for the specific offense characteristic of the possession of a firearm, adjusted up four levels for his role as an organizer and leader, adjusted up two additional levels for obstruction of justice, and adjusted down two levels in light of Minnis' acceptance of responsibility, bringing his advisory Guidelines' level to 42 with a category V criminal history. The corresponding advisory range was 360 months' incarceration to incarceration for life. The district court denied Minnis' motion for downward departure and declined to vary from the advisory range based on the factors enumerated in 18 U.S.C. § 3553. Minnis received 420 months' incarceration on Count 1 and 240 months' incarceration on Count 2, to run concurrently, in addition to forfeiture in the amount of $25,340 and supervised release for life. Minnis appeals the denial of a psychiatric evaluation, the calculation of drug quantity for which he was responsible as it determined his base offense level, the adjustment for possession of a firearm, the adjustment for obstruction of justice, and the reasonableness of his sentence.

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

## II.    DISCUSSION

### A.    Psychiatric Evaluation

In a handwritten letter to the court, Minnis requested a "psychiatric psychological evaluation." At a hearing, Minnis stated under oath that he was stressed by the status of the case, was having difficulty sleeping, was upset and talking to himself, felt inadequately represented by counsel, felt that nothing was going right for him in the case, and had been molested as a child. The district court denied the request for evaluation.

Decisions regarding competency hearings are factual findings that we will affirm "'unless clearly arbitrary or unwarranted, or clearly erroneous.'" United States v. Cook, 356 F.3d 913, 918 (8th Cir. 2004) (quoting United States v. Voice, 627 F.2d 138, 141 (8th Cir. 1980)). A court may grant hearings or evaluations on a defendant's competency when "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

Here, the district court observed Minnis and determined that he was not so mentally disturbed as to be unable to assist in his own defense. Indeed, Minnis himself authored the motion for psychiatric evaluation when he felt that his counsel was taking too long to do so. Further, the afflictions complained of–stress, lack of sleep, and general depression–are not the type of mental disease or defect rendering individuals mentally incompetent. As we have noted, even the "[p]resence of a mental illness does not equate with incompetency to stand trial." Cook, 356 F.3d at 918 (alteration in original) (quotation omitted). Given the hearing testimony and the district court's ability to observe Minnis face-to-face, we cannot say that it was clearly erroneous to, after a hearing, deny the psychiatric evaluation.

## B.    Calculation of Drug Quantity

Minnis pled guilty to the superseding indictment's allegations of conspiracy to distribute and possess with the intent to distribute heroin, cocaine, and crack cocaine and possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841 and 846. The Guideline for a violation of section 841 is found in U.S. Sentencing Guideline (U.S.S.G.) §2D1.1, which references the Drug Quantity Table.

The government must prove the quantity of drugs for which Minnis is responsible by a preponderance of the evidence. United States v. Johnston, 353 F.3d 617, 625 (8th Cir. 2003). The district court found that Minnis was responsible for more than ten kilograms but less than thirty kilograms of heroin, making his Guidelines base offense level 36. Minnis alleges that the evidence was insufficient to support that finding. Specifically, he claims that it was improper to count 115 ounces of heroin believed to have been sold before April 2004, and that it was improper to hold Minnis responsible for projected amounts of "cut" heroin.[2] We review the district court's factual finding of drug quantity for clear error and "will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made." United States v. Newton, 31 F.3d 611, 614 (8th Cir. 1994).

The district court heard extensive evidence in order to determine the quantity of heroin for which Minnis was responsible. Much of the evidence came from the testimony of D.E.A. Special Agent James McHugh, one of the case agents in charge of the Minnis investigation. The government additionally introduced and played

---

[2]The government presented testimony that "cutting" heroin is a process where unadulterated or "pre-cut" heroin is mixed with another substance–in this case, Dormin (diphenhydramine)–in order to dilute the "pre-cut" heroin and increase the amount of sellable "cut" heroin. Various mixtures can be made to achieve the desired potency of the "cut" heroin. For instance, in a "two cut," a dealer would add two ounces of Dormin to an ounce of heroin to make three "cut" ounces.

numerous tape-recorded phone conversations in which Minnis discussed drug transactions.

The evidence revealed four heroin quantities. First, based on surveillance, controlled buys, and phone conversations, McHugh testified that he believed Minnis had sold 115 ounces, or 2.87 kilograms, of heroin before April 2004. Through further similar investigative techniques, McHugh and other investigators determined that Minnis gathered $115,000 which he intended to use to buy more heroin. McHugh also testified that Minnis charged $1,000 per ounce of "cut" heroin. From this evidence, McHugh extrapolated that Minnis had already dealt 115 ounces of "cut" heroin.

The second quantity of heroin was approximately six ounces of "pre-cut" black tar heroin. McHugh testified that wiretaps intercepted Minnis directing associates to mail the heroin through the U.S. Mail to an apartment belonging to a co-conspirator's grandmother. When the package was seized, McHugh obtained a search warrant, which, when executed, yielded the six ounces (156.9 grams) of heroin.

The third quantity was 120 ounces (three kilograms)[3] of "pre-cut" heroin seized from two couriers working for Minnis. The two women were stopped en route to St. Louis from California carrying the heroin Minnis purchased. Minnis, following in another car, saw St. Louis County Police stop his couriers. He called one of the couriers on her cell phone, instructing her and her associate to step away from the car in the hopes that the canine would not detect the heroin concealed in their pants.

The fourth and final quantity involved fifty "pre-cut" ounces of heroin that was never seized by law enforcement. The government introduced tape recordings of Minnis discussing an expected delivery of fifty ounces as well as subsequent tape-

---

[3]McHugh testified that an ounce of heroin is often called a "Mexican ounce," containing 25 grams per ounce, rather than the "standard ounce being 28.6 grams."

recorded calls confirming receipt of the fifty ounces. This later recording also indicated that Minnis planned "to do a four," which apparently means to do a "three cut," adding three ounces of Dormin to every ounce of heroin, producing two hundred ounces (five kilograms) of "cut" heroin for distribution.

In summation, the court was presented the following quantities: 2.87 kilograms of "cut" heroin, 156.9 grams of "pre-cut" heroin, three kilograms of "pre-cut" heroin, and fifty ounces of "pre-cut" heroin which would be "cut" into five kilograms.

Minnis alleges that the evidence leading the district court to hold him responsible for a quantity of heroin greater than ten kilograms was insufficient in two ways. First, Minnis alleges that the government's use of the $115,000 purchase was insufficient evidence to hold him accountable for 115 ounces (2.87 kilograms) of heroin. Second, Minnis alleges that it was improper to consider possible "two cuts" and "three cuts" for the 156 gram and three kilogram quantities that were seized in their "pre-cut" form.

We have previously held that it is not error for district courts to extrapolate drug quantities from financial information such as the seizure of currency or evidence of wire transfers. See, e.g., United States v. Ortiz-Martinez, 1 F.3d 662, 675 (8th Cir. 1993); United States v. Carper, 942 F.2d 1298, 1303 (8th Cir. 1991). Because the evidence suggested that Minnis had no other means of gainful employment, sold heroin at $1,000 per ounce, and had $115,000 with which to purchase heroin, we cannot say the district court clearly erred in holding Minnis responsible for this amount.

Minnis next alleges that the evidence was insufficient to suggest he would have "cut" the 156 gram and three kilogram amounts of "pre-cut" heroin. As indicated, Minnis pled guilty in Count 1 to conspiracy to possess with the intent to distribute "a mixture or substance containing a detectable amount of heroin." Thus, to determine the amount of heroin for which Minnis was responsible, the government attempted to

prove the amount of "cut" heroin he conspired to distribute.[4] While the 2.87 kilogram amount extrapolated from the $115,000 was already "cut" and Minnis indicated his desire to "three cut" the fifty ounces into five kilograms, there was no specific evidence of what "cut" Minnis planned to make for the remaining 156.9 gram and three kilogram "pre-cut" quantities, other than evidence that it was Minnis' "normal pattern" to do at least a "two cut."

To summarize this evidence, the government provided charts exhibiting the possible ranges of heroin dealt by Minnis based on the possible "cuts" that could be done on each quantity of "pre-cut" heroin. This chart also included the already "cut" 2.87 kilograms and the fifty ounces to be "cut" into five kilograms. The chart showed that the total minimum amount of heroin for which Minnis could be responsible was 18.825 kilograms of heroin; the total maximum amount could be 26.875 kilograms.

The court made its quantity calculation while ruling on an objection to a paragraph in the pre-sentence report which stated that Minnis was responsible for an amount of heroin in excess of ten kilograms, warranting the base offense level of 36. It appears from the transcript that there was some confusion over whether Minnis' statement that he was going "to do a four" meant he would "three cut" or "four cut" the fifty ounces. The district court calculated as follows:

> Well, we know about the 156-gram seizure of heroin on April 6. We know about the 120 Mexican ounce seizure of heroin on April 12. The $115,000 transaction . . . has been, in effect, used to establish how much heroin had to have been sold to put together that amount of money for the transaction. Results in 2.87 kilograms. I think all those things have been established by a preponderance of the evidence. There's no doubt that the 50-ounce delivery was made on May 3 because we've heard

---

[4]Minnis does not challenge that it is error to consider the quantity of "cut" heroin rather than the amount of "pre-cut" heroin. He only argues that there is insufficient evidence to sentence him based on the projected amounts of "cut" heroin that he might have distributed.

wiretaps that are undisputed before this Court which leads the Court to conclude, by a preponderance of the evidence, that that transaction took place, because immediately after that transactions are, in fact, taking place by Mr. Minnis with others. That's where we get to, Is [sic] it a three or a four cut? We don't have those conversations if we don't have anything to cut. So to find otherwise defies logic and common sense in this case. That brings us to a minimum, under this transaction, of 17 kilograms of heroin. And I find, by a preponderance of the evidence, that [the summary charts] accurately reflect, by a preponderance of the evidence, the testimony in this case, and the undisputed testimony.

Taking the quantities as the district court recited them, we are left with 156 grams, 120 Mexican ounces (three kilograms), the extrapolated 2.87 kilograms, and fifty ounces "cut" by either three or four. In light of McHugh's testimony that "to do a four" meant to "three cut" the heroin into five kilograms, we use that amount.[5] In our calculation, the recited quantities equal 11.026 kilograms. While the district court mentioned seventeen kilograms, the difference is irrelevant given that either quantity is an amount in excess of ten kilograms, leaving Minnis' base offense level at 36, as the district court found. Further, our 11.026 kilogram quantity is based on the "pre-cut" quantities of 156 grams and three kilograms actually seized, the permissible extrapolation of 2.87 kilograms, and Minnis' admitted plan to "three cut" the fifty-ounce quantity into five kilograms.[6] Thus, we find that the district court did not

_____

[5]A "three cut" would be adding three ounces of Dormin to every ounce of "pre-cut" heroin. Thus, fifty ounces of "pre-cut" heroin would be cut with 150 ounces of Dormin, yielding 200 ounces of "cut" heroin. Given that each of these "Mexican ounces" weighs 25 grams, we arrive at a total of five kilograms of heroin.

[6]The written out calculation is
$$\begin{array}{r} 0.156 \text{ kg} \\ 3.000 \text{ kg} \\ 2.870 \text{ kg} \\ + \underline{5.000 \text{ kg}} \\ 11.026 \text{ kg} \end{array}$$

clearly error in its finding that Minnis was responsible for a quantity of heroin in excess of ten kilograms.

### C.    Possession of a Firearm

After calculating the base offense level as 36, the district court added two levels for possession of a firearm under U.S.S.G. §2D1.1(b)(1).  Minnis argues that the government failed to prove that the firearm belonged to Minnis or was used in connection with the distribution of drugs.

At the sentencing hearing, to support the adjustment for possession of a firearm while engaging in a conspiracy to distribute heroin, the government called St. Louis Police Officer Patrick Daut, who previously responded to a domestic disturbance call at 5167 Raymond in St. Louis.  Upon his arrival, Daut saw Minnis fleeing out the back of the residence.  Daut learned that Minnis was the domestic disturbance suspect and arrested him.  Daut then contacted Minnis' victim and asked and received permission to search the residence.  The search included a bedroom where Daut noticed men's clothing lying around the room.  In addition to the men's clothing, the search of the room revealed a 9 mm firearm, cocaine, latex gloves, and wads of money in the amount of approximately $25,000, all indicating drug distribution.

We review the district court's interpretation and application of the Guidelines de novo.  United States v. Mashek, 406 F.3d 1012, 1017 (8th Cir. 2005).  We review the factual finding of the use of a firearm in connection with the drug offense for clear error.  United States v. Cave, 293 F.3d 1077, 1079 (8th Cir. 2002).  Application note 3 to U.S.S.G. §2D1.1 states that "[t]he adjustment should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." (Emphasis added).  Further, "[t]he government need not show that the defendant used or even touched a weapon to prove a connection between the weapon and the offense," in this case, conspiracy to distribute drugs.  United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir. 2000).  "Evidence that the weapon was found in the

same location as drugs or drug paraphernalia usually suffices." Id. In light of this precedent and the facts surrounding the seizure of the firearm at 5167 Raymond, we cannot say that it was clear error to find that Minnis qualified for the two-level enhancement under U.S.S.G. §2D1.1(b)(1).

### D.    Obstruction of Justice

The district court also assessed Minnis with a two-level upward adjustment for obstruction of justice under U.S.S.G. §3C1.1. Minnis argues, in effect, that because his actions did not actually impede or hamper the investigation, his sentence cannot be increased under the obstruction of justice adjustment.

Again, we review the interpretation and application of the Guidelines de novo. Mashek, 406 F.3d at 1017. Here, the district court interpreted and applied the plain language of U.S.S.G. §3C1.1: "If (A) the defendant willfully . . . attempted to obstruct or impede[] the administration of justice with respect to the investigation . . . of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction . . . increase the offense level by **2** levels." We have traditionally given the district courts broad discretion to apply the obstruction of justice enhancement to a wide range of conduct. United States v. Lyon, 959 F.2d 701, 707 (8th Cir. 1992). Here, in addition to other obstructive actions, Minnis willfully and successfully sought out a police officer to access secure databases. Minnis then provided the officer a list of individuals whom Minnis believed may have been aiding the police investigation against him and, using those databases, the officer informed Minnis whether each individual was an informant. This is clearly a willful attempt to obstruct the investigation against him that falls within the wide range of conduct allowing a district court to apply the adjustment. We find no clear error in the district court's decision to increase Minnis' offense level by two levels for obstruction of justice.

## E.    Reasonableness of Sentence

Minnis finally challenges his sentence as unreasonable.  We review for abuse of discretion, reversing only if the court failed to consider a relevant factor that should have received significant weight, gave significant weight to an improper or irrelevant factor, or considered the appropriate factors but, in weighing those factors, committed a "clear error of judgment."  United States v. Haack, 403 F.3d 997, 1004 (8th Cir.), cert. denied, 126 S. Ct. 276 (2005).

Minnis argues that the district court failed to consider Minnis' "extraordinary family situation," which, he believes, should have garnered significant weight. Specifically, Minnis, both personally and through counsel, informed the court of extraordinary physical abuse suffered as a child, neglect, poverty, a lack of education and youthful guidance, and an alleged rape he suffered during his childhood.[7]  Minnis also noted that his co-conspirators received sentences ranging from 48 to 188 months' incarceration, well below his advisory range of 360 months to life.

After argument, the district court recited the 18 U.S.C. § 3553(a) factors that must be considered in arriving at a reasonable sentence.  The court noted that Minnis' crime is "a very serious crime.  It would be awfully easy . . . to sentence you to life in prison.  And I don't mean that lightly."  The court also noted the gravity of the sentences for Minnis' two less culpable couriers, both of whom received 120 months' imprisonment.  Finally, the court noted its belief that 420 months' incarceration was the appropriate sentence because "that sentence . . . doesn't minimize the seriousness of [the crime] by being at the bottom of the guideline range, serves the statutory

---

[7]These arguments were specifically made in the context of a motion for downward departure, which the district court denied, and which is generally unreviewable on appeal.  See e.g., United States v. VanHouten, 307 F.3d 693, 696 (8th Cir. 2002).  We repeat these arguments here as they were also relied upon in Minnis' request for variance under 18 U.S.C. § 3553(a).

purposes of punishment, deterrence, and incapacitation, protects the public, and avoids unwanted sentencing disparities." The court also noted that Minnis "ha[s] a lot of potential" and was sentenced in this manner on "the theory that there's a chance that [he] would get to go home some day and make something out of [his potential]."

Based on the district court's extensive consideration of Minnis' arguments and its section 3553(a) analysis, we cannot say that the court abused its discretion in sentencing Minnis within the advisory Guideline range to 420 months' incarceration on Count 1, 240 months' incarceration on Count 2 and supervised release for life.

### F.    Other Issues Raised

While it is typically not our practice to allow defendants represented by counsel to submit pro se briefs, see United States v. Moore, 481 F.3d 1113, n.2 (8th Cir.), petition for cert. filed, No. 06-11595 (U.S. May 25, 2007), we allowed Minnis to present four additional arguments in a pro se brief. Having read his brief and carefully reviewed each of his claims in light of the record, we find them each to be without merit.

## III.   CONCLUSION

For the foregoing reasons, we affirm Minnis' conviction and sentence.
_____