# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-1999

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Salvador Mendoza, also known as | * | |
| Victor Quintero, also known as | * | |
| Arthur Gallegos, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 16, 2011
Filed: May 14, 2012

_____

Before RILEY, Chief Judge, BEAM and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

Salvador Mendoza pled guilty to conspiracy to distribute cocaine and possession with intent to distribute cocaine in violation of federal law. On appeal, Mendoza challenges (1) the district court's[1] denial of Mendoza's motion to suppress and (2) his sentence. We affirm.

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

## I.    BACKGROUND

### A.    Facts

In July of 2007, a concerned neighbor alerted Iowa City Police Department (ICPD) Officer Matthew Hansen about "unusual activity" occurring at a residence on the 1700 block of Louis Place in Iowa City, Iowa (Louis Place residence). The neighbor reported no one appeared to occupy the residence on a regular basis, but various people and vehicles came to the residence at "all different hours," parked their vehicles some distance from the residence, and carried packages in and out. Upon investigation, Officer Hansen discovered the residence's electricity service was in the name of Victor Quintero.

Neighbors also said a man who drove a red truck acted suspiciously on his frequent visits to the Louis Place residence, either parking the truck away from the residence or parking the truck in the garage and quickly shutting the door in an apparent effort to avoid being seen. Officer Hansen determined the red truck was registered to Michael Valencia of Muscatine, Iowa.

Neighbors also reported a black Hummer associated with the residence, and gave Officer Hansen its license plate number. Officer Hansen determined the Hummer was registered to Quintero at an address in the Forest View Trailer Park in Iowa City. Officer Hansen previously had received an anonymous tip that an individual driving a black Hummer had been selling cocaine at the trailer park.

Officer Hansen contacted the Muscatine County Drug Task Force regarding Valencia's red truck and spoke with officer Ardith Orr. Officer Orr was familiar with both Valencia and Quintero, and suspected both were involved in cocaine distribution in the Muscatine area. Officer Orr informed Officer Hansen that "Quintero" was an alias used by Mendoza. Officer Orr agreed to join Officer Hansen in surveilling the Louis Place residence.

The surveillance began on August 1, 2007, around 6:00 p.m. At least 10 or 12 officers in separate unmarked vehicles at different locations participated in the surveillance. At some point, the officers received a radio announcement about a vehicle matching the description of Valencia's red truck leaving the area, and three or more of the unmarked surveillance vehicles followed it. The officers followed the truck as it drove to the post office in downtown Iowa City and then out of town. The driver of the red truck began to drive erratically—constantly changing directions, driving in circles or turning around with no apparent destination; making sudden turns, turning without signaling, and driving in the wrong lane; or stopping on the side of the road so the surveillance vehicles would drive past. The surveilling officers believed these were counter-surveillance maneuvers and the driver of the vehicle was aware of the police presence.

The officers decided to discontinue the surveillance, and stopped on a gravel road to regroup. While the officers were stopped, the red truck drove past. The officers decided to stop the truck, so they pursued. The red truck then pulled over of its own accord, and the driver exited the vehicle. Detective Paul Batcheller of the ICPD Street Crimes Unit activated a warning light for safety and then exited his vehicle and made contact with the driver.

The driver identified himself as Quintero, and eventually produced identification in that name. The officers subsequently identified him as Mendoza. When Detective Batcheller discovered Mendoza spoke Spanish and had very limited English language ability, he called for assistance from ICPD Officer Jeff Fink, a highly proficient Spanish language interpreter. Detective Batcheller also summoned ICPD K-9 handler Officer Kevin Berg and his narcotic-detection dog Naton. Officer Berg arrived ten to fifteen minutes later, and, with Naton, conducted an investigatory sniff on the exterior of Mendoza's vehicle. Officer Berg and Naton conducted two passes. On the second pass, Naton indicated at the vehicle's driver's side door, signaling to Officer Berg that Naton had detected a drug odor.

Officer Fink arrived twenty to twenty-five minutes after receiving the call, just as Officer Berg and Naton finished the sniff. Officer Fink began translating for Detective Batcheller. At the officers' request, Mendoza consented to a search of his vehicle and his person. The officers discovered a cell phone and more than $800 on Mendoza's person. In the vehicle, the officers discovered a "Fix-a-Flat" tire-repair canister with a false bottom and a hidden compartment containing cocaine residue.

Mendoza told Officer Fink and Detective Batcheller he lived at the Louis Place residence. The officers requested Mendoza's permission to search the residence, and Officer Fink informed Mendoza he did not have to consent to the search. Mendoza did not initially agree to the request. After discussing the consent-to-search form with Officer Fink, Mendoza said he might consent if the officers promised not to question him afterwards. Officer Fink and Detective Batcheller refused to add a clause to the consent-to-search form promising not to question him. Mendoza did not verbally consent to a search of the residence and did not sign the consent-to-search form, but Mendoza did not object when Officer Fink and Detective Batcheller informed him they were going to his house to search. In fact, Mendoza gestured in the direction of the residence in a way that indicated consent and then headed to the house.

Mendoza drove his own vehicle back to the Louis Place residence and let the officers inside. Mendoza informed the officers a man named Ivan or Evan occupied a basement bedroom, and said the officers should not go downstairs. At the suppression hearing, Officer Fink testified that, at the time, he believed Mendoza had consented to a search of the basement so long as the officers avoided this bedroom. Mendoza was present in the house for the duration of the search and did not object to the officers' search of the basement.

In the basement, the officers discovered a room coated so thickly with white residue the officers initially thought it was drywall dust. A field test of the white powder indicated it was, in fact, cocaine residue. The room contained what Officer

Hansen described as a shrine to Saint Mary, with candles; Inositol[2] powder; scales; a wooden press; mixing bowls and equipment; industrial-sized rollers of plastic wrap; and air filters or purifiers. In the kitchen, the officers discovered wooden boards with brick-shaped outlines of cocaine residue and cloths on which matching brick-shaped imprints of cocaine residue were visible. In Officer Hansen's experience, all of this indicated a large-scale cocaine operation.

## B. Procedural History

Mendoza was indicted for conspiracy to manufacture, distribute, and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A), and possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), and (b)(1)(B) and 18 U.S.C. § 2. Mendoza moved to suppress the evidence derived from the roadside stop and search of the Louis Place residence. The district court denied the motion, and Mendoza conditionally pled guilty. The district court found Mendoza was responsible for between fifteen and fifty kilograms of cocaine, resulting in a base offense level of 34. <u>See</u> United States Sentencing Guidelines (U.S.S.G.) § 2D1.1(C)(3) (drug quantity table). The district court sentenced Mendoza to two concurrent 180-month terms of imprisonment.

## II. DISCUSSION
### A. Motion to Suppress

Mendoza argues the district court erred when it denied his motion to suppress the "Fix-a-Flat" can discovered during the search of his vehicle and the evidence discovered during the search of the Louis Place residence. When reviewing the denial "of a motion to suppress, we review the district court's legal conclusions *de novo* and its findings of fact for clear error." <u>United States v. Frasher</u>, 632 F.3d 450, 453 (8th Cir. 2011).

---

[2]Inositol is a dietary supplement that can be used to dilute or "cut" cocaine.

### 1. Traffic Stop

The Fourth Amendment's prohibition against unreasonable searches and seizures requires that an investigatory traffic stop "be supported by at least a reasonable, articulable suspicion that criminal activity is afoot." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001); see also Terry v. Ohio, 392 U.S. 1, 30 (1968). When the police observe the driver of a vehicle commit a traffic violation, even a minor one, probable cause exists to stop the vehicle. See Frasher, 632 F.3d at 453.

The district court assumed, without deciding, the August 1 roadside encounter constituted a Fourth Amendment seizure of Mendoza, and found the seizure was supported by probable cause because the officers (1) observed Mendoza committing numerous traffic violations, and (2) had probable cause to believe Mendoza was driving without a driver's license. We agree the officers had probable cause to conduct a Fourth Amendment seizure based on Mendoza's erratic driving and traffic violations.[3]

Mendoza argues Officer Hansen's testimony concerning Mendoza's alleged traffic violations was "implausible on its face," United States v. Prokupek, 632 F.3d 460, 462 (8th Cir. 2011), because Officer Hansen's contemporaneous police report merely stated Mendoza made "random turns and stops," but did not describe any specific violations of the traffic code. Id. (explaining "when documents or objective evidence contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination") (quoting Anderson v. City of Bessemer City, N.C., 470

---

[3]We do not decide whether the officers had probable cause or reasonable suspicion to conclude Mendoza was driving without a driver's license. Mendoza's driving violations alone were sufficient to justify the stop. See Frasher, 632 F.3d at 453.

U.S. 564, 575 (1985)) (internal marks omitted). However, when the trial judge's credibility determination is based upon "a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson, 470 U.S. at 575. Officer Hansen's testimony was consistent with his contemporaneous report and believable, so the district court was entitled to accept it. The mere fact an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible.

Mendoza also complains that the prosecution failed to show which specific traffic laws Mendoza allegedly violated. This "failure" does not affect the validity of the district court's probable cause determination. The district court accepted Officer Hansen's testimony that he observed "traffic violations," including "not signaling, . . . [driving] in other lanes of traffic, [and] driving erratically." Iowa law requires motorists to signal turns and drive on the right-hand side of the road during normal operations, and prohibits reckless and careless driving. See Iowa Code §§ 321.315, 321.297, 321.277, 321.277(A). Thus, the officers had probable cause to stop Mendoza based upon Mendoza's apparent violations of the traffic laws.

Having conducted a lawful traffic stop, the officers were then justified in detaining Mendoza for a time reasonably necessary to conduct a limited investigation. See, e.g., United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id. at 916 (quoting United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992)) (internal marks omitted). At a minimum, a reasonable investigation can include "asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (quoting United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998)) (internal quotation marks omitted); see also Bloomfield, 40 F.3d at 915.

-7-

The officers were entitled to investigate officer Orr's report that "Victor Quintero" was Mendoza's alias and Mendoza was using false identification. In order to do so, it was necessary to summon a translator; thus, it was not unreasonable to detain Mendoza for the twenty to twenty-five minutes needed for Officer Fink to respond. Cf. United States v. Orta, 228 F. App'x 633, 634-35 (8th Cir. 2007) (unpublished per curiam) (deciding where a police officer made a "diligent effort" to investigate suspicious circumstances, it was not unreasonable to extend the duration of a traffic stop to summon a translator); Sanchez, 417 F.3d at 975 (concluding a forty-five minute investigative detention while the police verified the identity of a suspect carrying suspicious identification did not exceed the scope of an investigatory traffic stop).

It is well settled that a drug-dog sniff, without more, is not a "'search' within the meaning of the Fourth Amendment." United States v. Place, 462 U.S. 696, 707 (1983); see also United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). The exterior vehicle sniff here was completed around the time Officer Fink arrived to translate; consequently, the drug-dog sniff did not extend the scope or duration of the seizure in any way. See Illinois v. Caballes, 543 U.S. 405, 407-08 (2005). The drug dog's alert gave probable cause to detain Mendoza further and to search the vehicle. See $404,905.00 in U.S. Currency, 182 F.3d at 647, 649. The roadside stop and detention were entirely reasonable, and we detect no Fourth Amendment violation.

### 2.    Residence Search

The Fourth Amendment protects the sanctity of the home against unreasonable searches and seizures. U.S. Const. amend. IV. Absent a valid exception to the warrant requirement, a warrantless search of a person's home presumptively violates the Fourth Amendment. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The police may, of course, search a person's home with his or her consent, provided the consent is voluntary. See id. at 222. The government has the burden of showing

a reasonable officer would have believed the suspect actually consented to the search. See United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005). The validity of consent is a question of fact, which we review for clear error. See id.

The district court recognized the factual record made this case a close call. On the one hand, Mendoza did not explicitly state the officers were permitted to search the Louis Place residence or sign the consent-to-search form, and the significant police presence at the roadside stop and the residence raise the possibility Mendoza merely acquiesced to police authority. See id. at 773. On the other hand, Mendoza's gestures and body language indicated his consent. Officer Fink and Detective Batcheller specifically informed Mendoza of his right to refuse consent, and Mendoza clearly understood this right, because he initially refused consent and bargained with the officers regarding the terms of his consent.

As the district court found, on balance, Mendoza's behavior leading up to and during the search were consistent with consent. The record does not indicate any use of force, coercion, intimidation or deception by the officers. See United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (deciding the lack of any police use of force, coercion, or deception, and the fact that the defendant let the police into his home suggested the defendant consented to the police entry); United States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994) (determining the defendant's general demeanor and lack of hostility suggested consent to the search). The district court found, based on all the facts and circumstances, that Mendoza voluntarily consented to the search. This finding was not clear error.[4]

---

[4]Mendoza has not argued, and we decline to consider, whether the search of the basement exceeded the scope of his objective consent. See United States v. Shafer, 608 F.3d 1056, 1064-65 (8th Cir. 2010) ("The boundaries of a consensual search are confined to the scope of the consent, which is measured by a standard of objective reasonableness.").

**B. Sentencing**

Mendoza argues the district court erred in calculating the quantity of drugs involved in Mendoza's cocaine distribution conspiracy. The United States Probation Office prepared a Presentence Investigation Report estimating Mendoza was responsible for at least 150 kilograms of cocaine, resulting in a base offense level of 38. See U.S.S.G. § 2D1.1(C)(1) (drug quantity table). The district court found, based upon the evidence discovered in the Louis Place residence, that Mendoza was responsible for between fifteen and fifty kilograms of cocaine. Mendoza conceded the evidence supported a finding of five to fifteen kilograms, but denied the evidence could support a greater weight. We review the district court's drug-quantity determination for clear error and will affirm unless "the entire record definitely and firmly convinces us that a mistake has been made." United States v. Sicaros-Quintero, 557 F.3d 579, 581-82 (8th Cir. 2009) (quoting United States v. Minnis, 489 F.3d 325, 329 (8th Cir. 2007)).

> When the amount of drug seized by the government does not reflect the scale of the drug trafficking offense, as in this case, "the court shall approximate the quantity of the controlled substance" for sentencing purposes. U.S.S.G. § 2D1.1, comment (n.12). "The court may make a specific numeric determination of quantity based on imprecise evidence." United States v. Roach, 164 F.3d 403, 413 (8th Cir. 1998). It "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its accuracy." U.S.S.G. § 6A1.3(a).

Id. at 582.

The district court declared, "This is an unusual case and a difficult one to ascertain drug quantity." Nevertheless, the drug-quantity calculation was amply supported by the evidence. As the court reasoned, "Mr. Mendoza's lack of legitimate employment, the cash seized from his person and his residences, his history of

possessing substantial cash, and sending substantial cash to Mexico" and, most importantly, the cocaine-processing room at the Louis Place residence—which was literally coated in cocaine dust and contained a wide variety of cocaine-processing paraphernalia—provided ample evidence of a cocaine operation involving at least fifteen to fifty kilograms of cocaine, and possibly much more.

Mendoza also challenges the district court's drug-quantity finding on the ground that the testimony of a jailhouse informant was insufficient to prove Mendoza was a large-scale cocaine trafficker described by the informant as "Elesod" or "Primo." The flaw in Mendoza's argument is that the district court did not rely on the informant's testimony. While the district court "genuinely entertain[ed] a suspicion that the quantity revealed by the informant may [have been] greater than" the drug-quantity calculation the court ultimately adopted, the district court was "simply not comfortable making that finding by a preponderance of the evidence." Because the district court's drug quantity determination was not based on the challenged evidence, there could be no error.

## III.  CONCLUSION

The judgment and sentence are affirmed.

───────────────────────────